1  John T. Jasnoch (CA 281605)
   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
2  600 W. Broadway, Suite 3300
3  San Diego, CA 92101
   Telephone: 619-233-4565
4  jjasnoch@scott-scott.com

5  *Attorney for Plaintiffs and the Proposed Class*

6  [Additional Counsel on Signature Page.]

7              **UNITED STATES DISTRICT COURT**
8              **NORTHERN DISTRICT OF CALIFORNIA**

9   BRADLEY MORGAN; JESSE SMITHNOSKY;      Case No. _____
10  VINCENT LAM; ETE ADOTE; YINGZHI
    CHUA; MATT SZYMASZEK; IAN JOHNS;
11  DOUGLAS SCHADEWALD; ROGER LU;
    SILVESTER RUCKDASCHEL; JEFFREY         **CLASS ACTION COMPLAINT**
12  SLUZINSKI; ADAM NORTH; PHILIPPE LEE;
    HIO FONG MAK; TODD SPAFFORD;
13  STEPHEN MARSHALL; KASPER LUND;
    ANDREAS RASMUSSEN; ANTOINE
14  MEREMANS; VINCENT WONG; GEOFFREY
    CAPELLI; RALPH PORTER; ROBERT COMO;    DEMAND FOR JURY TRIAL
15  DANIEL FREEMAN; COLIN HARTLEY;
16  DANIEL LEE; HERSH STERN; ANDREAS
    OEE; BASTIAN BLUEM; BILAL AMAJJAR;
17  CHRIS MONEY; CHRISTOPHER BEDDIE;
    DANIEL RICEBERG; KISHAN NAZRE;
18  MIKKEL FABRICIUS; MOUSTAFA ACHEFY;
19  NELSON CHANG; THEO MOUSTROU;
    TAYLOR PAUR; MARCUS HOLLAND;
20  SCOTT BOHLMAN; DIANA KISLITSYNA; QI
    HU; SEAN GETZWILLER; MOJCA PERS;
21  CALVIN LEE; WILLIAM AYERS; HANSU
22  CHU; MATTHEW FARMER; DAVID LEE;
    DOMINIQUE MARCEL COULOMBE; HUN
23  WEI LEE; YAËL FAZY; MAURICE TAN;
    JEAN FERREIRA; ABDOU YEKINI; DHERAJ
24  AGARWAL; FRANKIE FAREED PATADEEN;
    JAN-EIKE WILKEN; TIMOTHY BARANY;
25

26

27  [*Caption continued on next page.*]

28

_____
                    CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11

ANTHONY DEGOL; MATTHEW HOYLE;
LUQMAAN RAWOOT; FRANCISCO JAVIER
FRANCO ALGARRADA; and ZACHARY
GRUNEBERG, Individually, and on Behalf of
All Others Similarly Situated,

    Plaintiffs,

  v.

CONSTELLATION NETWORK, INC.;
BENJAMIN JORGENSEN; WYATT
MELDMAN-FLOCH; BENJAMIN DIGGLES;
MATHIAS GOLDMANN; ALTIF BROWN;
BRENDAN PLAYFORD AND JOHN DOES 1-
10.

    Defendants.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Bradley Morgan, Jesse Smithnosky, Vincent Lam, Ete Adote, Yingzhi Chua, Matt Szymaszek, Ian Johns, Douglas Schadewald, Roger Lu, Silvester Ruckdaschel, Jeffrey Sluzinski, Adam North, Philippe Lee, Hio Fong Mak, Todd Spafford, Stephen Marshall, Kasper Lund, Andreas Rasmussen, Antoine Meremans, Vincent Wong, Geoffrey Capelli, Ralph Porter, Robert Como, Daniel Freeman, Colin Hartley, Daniel Lee, Hersh Stern, Andreas Oee, Bastian Bluem, Bilal Amajjar, Chris Money, Christopher Beddie, Daniel Riceberg, Kishan Nazre, Mikkel Fabricius, Moustafa Achefy, Nelson Chang, Theo Moustrou, Taylor Paur, Marcus Holland, Scott Bohlman, Diana Kislitsyna, Qi Hu, Sean Getzwiller, Mojca Pers, Calvin Lee, William Ayers, Hansu Chu, Matthew Farmer, David Lee, Dominique Marcel Coulombe, Hun Wei Lee, Yaël Fazy, Maurice Tan, Jean Ferreira, Abdou Yekini, Dheraj Agarwal, Frankie Fareed Patadeen, Jan-Eike Wilken, Timothy Barany, Anthony DeGol, Matthew Hoyle, Luqmaan Rawoot, Francisco Javier Franco Algarrada, and Zachary Gruneberg (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint ("Complaint") against Defendants Constellation Network, Inc. ("Constellation" or the "Company"), Brendan Playford, Benjamin Jorgensen, Wyatt Meldman-Floch, Benjamin Diggles, Mathias Goldman, and Altif Brown (the "Individual Defendants" and, together with Constellation, "Defendants").   The following allegations are based upon personal knowledge as to Plaintiffs' own facts, upon investigation by Plaintiffs' counsel, and upon information and belief where facts are solely in possession of Defendants.

## NATURE OF THE CASE

1.     This case arises from Constellation's refusal to allow investors to participate in a "swap" that the Company had arranged from its original cryptocurrency token (the "ERC-20 DAG Tokens") to its second cryptocurrency token (the "Mainnet DAG Tokens").[1]   Defendants purposefully designed the "Token Swap" in such a manner that the Company could exclude a large swath of investors from exchanging their ERC-20 DAG Tokens to the Mainnet DAG Tokens. These unswapped ERC-20 DAG Tokens do not, however, simply disappear.  As a result of their

---

[1]     The ERC-20 DAG Tokens and Mainnet DAG Tokens are collectively referred to as the "DAG Tokens."

actions with the Token Swap, Defendants created a secondary market for the unswapped ERC-20 DAG Tokens.  Defendants' simultaneous use of misleading marketing further compounded the problem by artificially inflating interest in Constellation generally, which, in turn, led investors seeking to invest in the Mainnet DAG Token into mistakenly purchasing the unswapped ERC-20 DAG Tokens.  Defendants are incentivized to continue to exclude ERC-20 DAG Token holders from swapping their tokens because doing so increases their proportional share of the Mainnet DAG Token supply and increases the monetary value of Defendants' Mainnet DAG holdings.

2.     A DAG token is a cryptocurrency created and maintained by Constellation.  DAG is a distributed ledger technology characterized as a "directed acyclic graph" that purports to implement a horizontally scalable blockchain architecture known as Extended Trust Chain with a peer-to-peer layer known as a gossip protocol.

3.     Plaintiffs bring this action on behalf of all investors who purchased Constellation's ERC-20 DAG Tokens after January 1, 2017 and were subsequently denied the ability to swap those ERC-20 DAG Tokens for Mainnet DAG Tokens.

4.     Following a successful initial coin offering ("ICO") that raised $33.7 million in 2018, Constellation's former Chief Executive Officer ("CEO"), Defendant Branden Playford mysteriously stepped down from his position.  With rumors circulating that Defendant Playford squandered the proceeds from the ICO day trading, investors demanded to know what had occurred.  Instead of disclosing the information regarding Defendant Playford and the ICO proceeds to investors, Defendants engaged in a scheme to (a) render early investors' ERC-20 DAG Tokens worthless and then exclude as many of those early investors as possible from swapping the ERC-20 DAG Tokens with the Company's newly-minted DAG Token; and (b) lure new investors into purchasing the unswapped ERC-20 DAG Tokens by using dubious online promoters to engage in misleading marketing tactics aimed at pumping up the token price.

5.     As set forth in detail below, Defendants controlled all aspects of the DAG Token Swap, including its timing and promotion.  Defendants failed to provide adequate notice to investors and made it onerous to swap the ERC-20 DAG Tokens to Mainnet DAG Tokens.  Then Defendants purposefully chose to continue to move forward with the Token Swap, despite it taking

place on a single day at the height of the COVID-19 pandemic in April 2020.  Making matters worse, Defendants used the COVID-19 pandemic as a basis for not communicating with investors during the lead up to the Token Swap.  Finally, even after the Token Swap closed, Defendants continue to allow investors to purchase the ERC-20 DAG Tokens on various decentralized cryptocurrency exchanges, and they refuse to remove information on these exchanges that both links the ERC-20 DAG Tokens to the Mainnet DAG Tokens and leads investors to believe they are purchasing the Company's official digital asset instead of now defunct ERC-20 DAG Tokens.

6.     Plaintiffs bring this class action on behalf of themselves and an objectively identifiable class consisting of all investors that purchased Constellation's ERC-20 DAG Tokens and were precluded from swapping to those ERC-20 DAG Tokens for Mainnet DAG Tokens.

### PARTIES

**Plaintiffs**

7.     Plaintiff Bradley Morgan is a resident and citizen of the United States, living in Warsaw, Poland.  Plaintiff Morgan purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

8.     Plaintiff Jesse Smithnosky is a resident and citizen of California, living in Laguna Beach, California.  Plaintiff Smithnosky purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

9.     Plaintiff Yingzhi Chua is a resident and citizen of Louisiana, living in Baton Rouge, Louisiana.  Plaintiff Chua purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

10.     Plaintiff Vincent Lam is a resident and citizen of Canada, living in Vancouver, Canada.  Plaintiff Lam purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

11.     Plaintiff Ete Adote is a resident and citizen of New York, living in Brooklyn, New York.  Plaintiff Adote purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

12.     Plaintiff Matt Szymaszek is a resident and citizen of California, living in Redondo Beach, California.  Plaintiff Szymaszek purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

13.     Plaintiff Ian Johns is a resident and citizen of Texas, living in Austin, Texas. Plaintiff Johns purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

14.     Plaintiff Douglas Schadewald is a resident and citizen of New York, living in New York, New York.  Plaintiff Schadewald purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

15.     Plaintiff Roger Lu is a resident and citizen of California, living in Long Beach, California.  Plaintiff Lu purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

16.     Plaintiff Silvester Ruckdaschel is a resident of Portugal, living in Lisbon, Portugal. Plaintiff Ruckdaschel purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

17.     Plaintiff Jeffrey Sluzinski is a resident and citizen of Nevada, living in Henderson, Nevada.  Plaintiff Sluzinski purchased ERC-20 DAG tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG for Mainnet DAG tokens

18.     Plaintiff Adam North is a resident and citizen of the United Kingdom, living in Derbyshire, England.  Plaintiff North purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

19.     Plaintiff Philippe Lee is a resident and citizen of California, living in Alhambra, California.  Plaintiff Philippe Lee purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

20.     Plaintiff Hio Fong Mak is a resident and citizen of California, living in El Monte, California.  Plaintiff Mak purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

21.     Plaintiff Todd Spafford is a resident and citizen of Nevada, living in Las Vegas, Nevada.  Plaintiff Spafford purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

22.     Plaintiff Stephen Marshall is a resident and citizen of Vermont, living in Morrisville, Vermont.  Plaintiff Marshall purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

23.     Plaintiff Kasper Lund is a resident and citizen of Norway, living in Stavanger, Norway.  Plaintiff Lund purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

24.     Plaintiff Andreas Rasmussen is a resident and citizen of Denmark, living in Copenhagen, Denmark.  Plaintiff Rasmussen purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

25.     Plaintiff Antoine Meremans is a citizen of Belgium, living in Banpo-dong, South Korea.  Plaintiff Meremans purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

26.     Plaintiff Vincent Wong is a resident and citizen of Thailand, living in Bangkok, Thailand.  Plaintiff Wong purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

27.     Plaintiff Geoffrey Capelli is a resident and citizen of Switzerland, living in Tavannes, Switzerland.  Plaintiff Capelli purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

28.     Plaintiff Ralph Porter is a resident and citizen of Washington, living in Woodinville, Washington.   Plaintiff Porter purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

29.     Plaintiff Robert Como is a resident and citizen of California, living in La Jolla, California.  Plaintiff Como purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

30.     Plaintiff Daniel Freeman is a resident and citizen of Nevada, living in Las Vegas, Nevada.  Plaintiff Freeman purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

31.     Plaintiff Colin Hartley is a resident and citizen of Canada, living in Nanaimo, Canada.  Plaintiff Hartley purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

32.     Plaintiff Daniel Lee is citizen of the United States, living in Seongdong-gu, South Korea.  Plaintiff Daniel Lee purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

33.     Plaintiff Hersh Stern is a resident and citizen of New Jersey, living in Monroe Township, New Jersey.  Plaintiff Stern purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

34.     Plaintiff Andreas Oee is a citizen of Denmark, living in Bangkok, Thailand. Plaintiff Oee purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

35.     Plaintiff Bastian Bluem is a resident and citizen of Germany, living in Bravaria, Germany.  Plaintiff Bluem purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

36.     Plaintiff Bilal Amajjar is a resident and citizen of the Netherlands, living in Almere, Netherlands.  Plaintiff Amajjar purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

37.     Plaintiff Chris Money is a resident and citizen of the United Kingdom, living in Tatenhill, England.  Plaintiff Money purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

38.     Plaintiff Christopher Beddie is a resident and citizen of Australia, living in Sydney, Australia.  Plaintiff Beddie purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

39.     Plaintiff Daniel Riceberg is a resident and citizen of California, living in Los Angeles, California.  Plaintiff Riceberg ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

40.     Plaintiff Kishan Nazre is a resident and citizen of New Jersey, living in Jersey City, New Jersey.  Plaintiff Nazre purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

41.     Plaintiff Mikkel Fabricius is a resident and citizen of Denmark, living in Roskilde, Denmark.  Plaintiff Fabricius purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

42.     Plaintiff Moustafa Achefy is a resident and citizen of Holland, living in Halfweg, Noord, Holland.  Plaintiff Achefy purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

43.     Plaintiff Nelson Chang is a resident and citizen of New Jersey, living in Livingston, New Jersey.  Plaintiff Chang purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

44.     Plaintiff Theo Moustrou is a resident and citizen of France, living in Biarritz, France.  Plaintiff Moustrou purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

45.     Plaintiff Taylor Paur is a resident and citizen of California, living in Oceanside, California.  Plaintiff Paur purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

46.     Plaintiff Marcus Holland is a resident and citizen of the United Kingdom, living in Exeter, England.  Plaintiff Holland purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

47.     Plaintiff Scott Bohlman is a resident and citizen of Illinois, living in Lemont, Illinois.  Plaintiff Bohlman purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

48.     Plaintiff Diana Kislitsyna is a resident and citizen of Australia, living in Brisbane, Australia.  Plaintiff Kislitsyna purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

49.     Plaintiff Qi Hu is a citizen of Canada, living in Ottawa, Canada.  Plaintiff Hu purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

50.     Plaintiff Sean Getzwiller is a resident and citizen of Nevada, living in Las Vegas, Nevada.  Plaintiff Getzwiller purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

51.     Plaintiff Mojca Pers is a citizen of Slovinia and the United Kingdom, residing in Haarlem, Netherlands.  Plaintiff Pers purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

52.     Plaintiff Zaheer Ahmed is a resident and citizen of California, living in Clovis, California.  Plaintiff Ahmed purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

53.     Plaintiff Calvin Lee is a resident and citizen of South Korea, living in Seoul, South Korea.  Plaintiff Calvin Lee purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

54.     Plaintiff William Ayers is a resident and citizen of New York, living in Malverne, New York.  Plaintiff Ayers purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

55.     Plaintiff Hansu Chu is a resident and citizen of California, living in Los Angeles, California.  Plaintiff Chu purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

56.     Plaintiff Matthew Farmer is a resident and citizen of Texas, living in Austin, Texas. Plaintiff Farmer purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

57.     Plaintiff David Lee is a resident and citizen of New York, living in New York, New York.  Plaintiff David Lee purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

58.     Plaintiff Dominique Marcel Coulombe is a resident and citizen of Canada, living in Kelowna, British Columbia.  Plaintiff Coulombe purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

59.     Plaintiff Hun Wei Lee is a resident and citizen of Australia, living in North Epping, Australia.  Plaintiff Lee purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

60.     Plaintiff Yaël Fazy is a resident and citizen of France, living in Annecy, France. Plaintiff Fazy purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

61.     Plaintiff Maurice Tan is a resident and citizen of Singapore, living in the Republic of Singapore.  Plaintiff Tan purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

62.     Plaintiff Jean Ferreira is a resident and citizen of Canada, living in the Quebec, Canada.  Plaintiff Ferreira purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

63.     Plaintiff Abdou Yekini is a resident and citizen of France, living in Dijon, France. Plaintiff Yekini purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

64.     Plaintiff Dheraj Agarwal is a resident and citizen of Malaysia, living in Kuala Lumpur, Malaysia.  Plaintiff Agarwal purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

65.     Plaintiff Frankie Fareed Patadeen is a resident and citizen of Trinidad and Tobago, living in San Juan, Trinidad and Tobago.  Plaintiff Patadeen purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

66.     Plaintiff Jan-Eike Wilken is a resident and citizen of Austria, living in Vienna, Austria.  Plaintiff Wilken purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

67.     Plaintiff Timothy Barany is a resident and citizen of Illinois, living in Chicago, Illinois.  Plaintiff Barany purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

68.     Plaintiff Anthony DeGol is a resident and citizen of California, living in La Jolla, California.  Plaintiff DeGol purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

69.     Plaintiff Matthew Hoyle is a resident and citizen of Florida, living in North Miami Beach, Florida.  Plaintiff Hoyle purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

70.     Plaintiff Luqmaan Rawoot is a resident and citizen of South Africa, living in Cape Town, South Africa.  Plaintiff Rawoot purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

71.     Plaintiff Francisco Javier Franco Algarrada is a resident and citizen of Spain, living in Madrid, Spain.  Plaintiff Algarrada purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

72.     Plaintiff Zachary Gruneberg is a resident and citizen of Pennsylvanie, living in Boalsburg, Pennsylvania.  Plaintiff Gruneberg purchased ERC-20 DAG Tokens and suffered investment losses as a result of not being allowed to swap the ERC-20 DAG Tokens for Mainnet DAG Tokens.

**Defendants**

73.     Defendant Constellation Network, Inc. is a business incorporated under the laws of the State of Delaware with its principal place of business at 480 5th Street, San Francisco, California 94107.   Constellation is engaged in the business of designing, implementing, and providing cybersecurity for various "big" data sets and data sources.   Constellation is headquartered in San Francisco, and its marketing efforts emanate from California.   Defendant Constellation is a citizen of the State of California.

74.     Defendant Benjamin Jorgenson is a resident and citizen of California, living in San Francisco, California.  Jorgenson currently serves as the CEO of Constellation.

75.     Defendant Brendan Playford is a resident and citizen of California, living in San Francisco, California.   Playford previously served as the Company's CEO prior to Defendant Jorgenson.

76.     Defendant Wyatt Meldman-Floch is a resident and citizen of California, living in San Francisco, California.  Meldman-Floch was a Co-Founder of Constellation, and he currently serves as the Company's Chief Technical Officer ("CTO").

77.     Defendant Benjamin Diggles is a resident and citizen of Colorado, living in Denver, Colorado.  Diggles was a Co-Founder of Constellation (also previously serving as Constellation's Vice President of Business Development), and he currently serves as the Company's Chief Strategy Officer.

78.     Defendant Mathias Goldmann is a resident and citizen of California, living in San Francisco, California.  Goldmann was a Co-Founder of Constellation, and he currently serves as the Company's Vice President of Finance.

79.     Defendant Altif Brown is a resident and citizen of California, living in San Francisco, California.  Brown was a Co-Founder and former Chief Communication Officer of Constellation, and he currently serves as the Company's Global Community Architect.

80.     Defendants John Doe 1-10 are persons who participated in the wrongdoing alleged herein but whose identities are currently unknown to Plaintiffs.  Plaintiffs will identify the John Doe Defendants through discovery of Constellation and/or the Individual Defendants.

## JURISDICTION AND VENUE

81.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because at least one Plaintiff and Defendants are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

82.     This Court may exercise jurisdiction over Defendants because Constellation is a citizen of this State and District and maintains its principle place of business in this District, has continuous and systematic contacts with this District, does substantial business in this State and within this District, and engages in unlawful practices in this District as described in this Complaint, so as to subject itself to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

83.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because Constellation is headquartered and operates in this District, therefore, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

84.     **Division Assignment**:  This action should be assigned to the San Francisco Division of this Court, as the Company's principal place of business is in San Francisco, California, under Local Rule 3-2(d).

## FACTUAL ALLEGATIONS

### Constellation Background

85.     Constellation's business purportedly provides cybersecurity for large data sets and sources.  The Company offers "a software infrastructure tool that removes the financial and organizational cost of insecure data pipelines and bad data.  It provides a secure and tamper-proof audit trail that simultaneously validates your data."[2]

---

[2]     https://icoholder.com/en/constellation-network-21562 (last visited Oct. 18, 2021).

86.     According to the Company, its goal is to "build a technological world where truth is apparent, power is fairly distributed and reputation matters."[3]

87.     On June 15, 2018, Constellation held its ICO, selling 720,000,000 ERC-20 DAG Tokens for a total of $33.7 million.  ERC-20 DAG Tokens are blockchain-based assets that are created using the Ethereum blockchain.  After an ERC-20 token is created, it can be traded, spent, or otherwise transacted with.

88.     The ERC-20 DAG Tokens sold in this ICO represented 18% of the DAG tokens available.[4]

89.     The ERC-20 DAG Tokens were sold pursuant to a "whitepaper."  Whitepapers in cryptocurrency are documents released by the founders of the project that gives investors technical information about its concept, and a roadmap for how it plans to grow and succeed.  The Constellation whitepaper was entitled "Constellation, a Blockchain Microservice Operating System" and nowhere mentioned that the ERC-20 DAG Tokens would be subject to swap onto the Constellation mainnet.

90.     Following the ICO, the Constellation community was abuzz with rumors that Constellation's then-CEO, Defendant Brendan Playford, inappropriately used the millions of dollars that were raised in the ICO as his personal piggybank to day trade cryptocurrencies, eventually losing a significant portion of it.

91.     Defendant Playford has a long track record of being publicly acknowledged as having "been involved in the crypto sector as a miner, **trader**, and data scientist."[5]

92.     Defendant Playford has also made public statements indicative of someone that closely monitors detailed information about the cryptocurrency trading market.  For example, on April 12, 2018 (just two months before the Constellation ICO) Defendant Playford wrote an email

---

[3]     LCX Press Release, *Constellation Network Chooses LCX as Partner* (Mar. 28, 2021), https://www.prnewswire.com/news-releases/constellation-network-chooses-lcx-as-partner-301257193.html.
[4]     All transactions in the ERC-20 DAG Token are recorded on the ethereum blockchain, available at https://etherscan.io/token/0xa8258abc8f2811dd48eccd209db68f25e3e34667.
[5]     Nulltx, *What Is Constellation Cryptocurrency*, BITNEWSBOT (June 28, 2018), https://bitnewsbot.com/what-is-constellation-cryptocurrency-nulltx/ (emphasis added).

1    to MarketWatch for an article entitled, "Bitcoin trading volume hits record high."[6]   With no

2    introduction or preamble, Defendant Playford is quoted as gratuitously saying: "Over the past two

3    weeks there has been a steady increase in short positions with people betting against the price of

4    bitcoin.  This was up until yesterday the total number of open bitcoin short positions on Bitfinex

5    reached a 6-month high of 40,000 open shorts, while the price remained in range."[7]

6         93.    In a different article that same day on whether bitcoin's then-recent gains were the

7    result of a trading "short squeeze," Defendant Playford's email is quoted again.[8]   He expands

8    further on the technical analysis of bitcoin's trading activity, stating: "Further, the long/short ratio

9    on bitcoin hit a record low of 0.80 and started to recover, which indicates that short risk is

10   increasing and more people in the market are gaining confidence in long positions in bitcoin. . . .

11   This is still early, and the market remains in the long-term downtrend."[9]

12        94.    Following Constellation's ICO, Defendant Playford continued to demonstrate his

13   more-than-casual interest in highly speculative crypto trading.  For example, on September 8,

14   2018, Defendant Playford shared the "Ethereum/USDshort crypto chart" on Twitter, saying:

15   "Around 100k or ~40% of all open shorts on $ETH opened under $290.  Seems like a pretty big

16   target to me."[10]

17        95.    Throughout December 2018, despite having a company to run with its coffers

18   supposedly filled after a successful ICO (*i.e.*, Constellation), Defendant Playford's only tweets

19   were about speculation in the broader cryptocurrency market, price targets and trading volume.

20

21

22

23   ───────────────────────

24   [6]    Aaron Hankin, *Bitcoin trading volume hits record high*, MARKETWATCH (Apr. 12, 2018),
     https://www.marketwatch.com/story/bitcoin-trading-volume-hits-record-high-2018-04-12.

25   [7]    *Id.*

26   [8]    Aaron Hankin, *Is bitcoin's biggest gain in 2 months a short squeeze or a change in
     sentiment?*, MARKETWATCH (Apr. 12, 2018), https://www.marketwatch.com/story/is-bitcoins-
     biggest-gain-in-2-months-a-short-squeeze-or-a-change-in-sentiment-2018-04-12.

27   [9]    *Id.*

28   [10]   https://twitter.com/BrendanPlayford/status/1038564874727632903 (last visited Oct. 18,
     2021).

───────────────────────

1   On December 2, 2018, he retweeted a post about "Bitcoin Market Sentiment."[11]   Then on

2   December 7, 2018, Defendant Playford announced that "$BTC and $ETH near-term target hit."[12]

3



4

5

6

7

8

9   The following day on December 8, Defendant Playford tweeted his concerns about weak volume

10  in the cryptocurrency market: "Bounce volume not looking great.  We still need a follow through.

11  Lots of thin air if we do not hold above here.  $BTC $ETH"[13]  On December 13, 2018, Defendant

12  Playford congratulated himself on his ability to predict the cryptocurrency market's price action

13  by giving the following response to an earlier tweet of his from January 1, 2018:[14]

14      96.   Defendant Wyatt Meldman-Floch knew, or should have known, about Defendant

15  Playford's trading activities with the Constellation ICO proceeds but did nothing about it.

16  Importantly, Defendants Meldman-Floch and Playford have a separate, long-standing relationship

17  outside of their work together at Constellation.  For example, Defendants Meldman-Floch and

18  Playford were the founders of another company called Rakugo, which claimed to be building a

19  decentralized publishing platform.  Defendants Meldman-Floch and Playford also served as

20  Rakugo's CEO and CTO, respectively.

21

22

23

24

25  [11]    https://twitter.com/CryptoCoq/status/1069247988445384704 (last visited Oct. 18, 2021).

    [12]    https://twitter.com/BrendanPlayford/status/1071100701638422528 (last visited Oct. 18,
26  2021).

    [13]    https://twitter.com/BrendanPlayford/status/1071281663072583680 (last visited Oct. 18,
27  2021).

    [14]    https://twitter.com/BrendanPlayford/status/1073318212354199553 (last visited Oct. 18,
28  2021).

1      97.     Rakugo held an ICO from August 19, 2017 to September 19, 2017,[15] the surrounding circumstances of which bear an eerie similarity to the Constellation ICO.  Upon information and belief, after taking investors' money during the Rakugo ICO, Defendants Meldman-Floch and Playford inexplicably returned the money three weeks later.  DAG investors on the cryptocurrency forum Bitcointalk.org claimed that Rakugo executives like Defendants Meldman-Floch and Playford "were trading with [the proceeds of the Rakugo ICO] for profit during the time we all waited to get our tokens back."[16]

98.     Around July 2019, Defendant Playford inexplicably left Constellation and stepped down as the Company's CEO.

99.     Defendants did not formally acknowledge Defendant Playford's departure until months later.  Only after investors demanded an official response did Defendant Brown finally provide an explanation, albeit a vague and opaque one.

100.    Specifically, on October 30, 2019, after an investor wrote to the Constellation Telegram group that investors had "a right to [k]now as to why Brendan Playford is no longer CEO or part of the constellation team[,]"[17] Defendant Altif replied:

> Brendan is stepping down as the CEO of Constellation Labs and as a member of the Constellation Foundation board to focus his attention on his passion for the consumer adoption of blockchain technology in developing economies and nations. Constellation has been restructuring the organization where the founders empower cross departmental alliances and decision-making.  The company has named Ben Jorgensen CEO and Brendan's tokens remain with the foundation.
>
> As a result, Brendan sees an opportunity to leverage his strengths to other blockchain and community based initiatives.  Given his strengths that include product development, growth and design, as well as engaging with a broad community, he sees the opportunity to support Constellation and the blockchain space as a whole while not being a part of the day to day operations.  Stepping back from Constellation will allow the organization to focus on building and deploying

---

[15]    *In Depth – What is Rakugo – An Ethereum based content publishing platform*, STEEMIT, https://steemit.com/blockchain/@conradhann/in-depth-what-is-rakugo-an-ethereum-based-content-publishing-platform (last visited Oct. 18, 2021); *see also* https://bitcointalk.org/index.php?topic=2044732.0 [Rakugo profile] (last visited Oct. 18, 2021).

[16]    https://bitcointalk.org/index.php?topic=2702538.msg29143698#msg29143698 (last visited Oct. 18, 2021).

[17]    https://t.me/constellationcommunity/80717 (last visited Oct. 18, 2021).

the Constellation mainnet. Constellation wishes Brendan the best in his future endeavors.[18]

101.    Notably, Defendant Altif did not provide any explanation as to why Defendant Playford – who was supposedly leaving on amicable terms – would seemingly abandon his DAG tokens (presumably worth hundreds of thousands, if not millions, of dollars) and freely return them to the Company.

102.    When Constellation investors subsequently reached out to the Constellation team via the Company's Telegram social media account to ask about the specific circumstances surrounding Playford's departure, the Constellation administrators immediately banned these investors from the Telegram group and accused them of trying to spread so-called "F.U.D." in an effort to silence and discredit the investors seeking to gain access to highly significant, undisclosed information related to the Company.[19]

103.    As of the filing of this action, Constellation has made no announcement to investors regarding the fate of the $33.7 million ICO investment.

104.    Following Defendant Playford's departure, the remaining Company executives, including Defendants, began plotting ways to recoup the lost ICO proceeds without publicly disclosing what had occurred.

105.    Defendants' first move was to downsize drastically while simultaneously hiring a group of freelance online cryptocurrency promotors known as "Satsgang"[20] to fraudulently promote the DAG tokens to unsuspecting investors.

106.    Upon information and belief, many of Constellation's employees left the Company as a consequence of Defendant Playford's misuse of Company funds. For example, at least three[21]

---

[18]    https://t.me/constellationcommunity/80721 (last visited Oct. 18, 2021).

[19]    "F.U.D." is an acronym for fear, uncertainty, and doubt. Those accused of spreading FUD are generally viewed negatively by the cryptocurrency community.

[20]    The group known as Satsgang has since rebranded itself as the "Spectre Grp" in an apparent effort to distance themselves from any associations with former Satsgang activities.

[21]    Constellation's VP of Operations, Emily Arth, does not maintain a Linkedin profile. As of the filing of this action, Ms. Arth's other public social media indicates that she has not posted anything about Constellation since 2018.

of Constellations Vice Presidents left the Company in the lead up to Defendant Playford's departure around July 2019: VP of Marketing, Zac Russell (May 2019);[22] VP of Product, Brion Hickey (June 2019);[23] and VP of Engineering, Ryle Goehausen (July 2019).   Similarly, Constellation's Lead Product Designer, Giovanni Valdenegro and Marketing Manager, Gina Rubino left Constellation between the ICO and Defendant Playford's official stepping down.

107.   Even Defendant Altif Brown, Constellation's Chief Communications Officer, has been demoted on the Company's website to an "Advisor," indicating that he is no longer a full-time employee of the Company.[24]

108.   Meanwhile, as the Company was jettisoning most of its employees, Defendants simultaneously entered into an arrangement with a group of shills-for-hire, the notorious Satsgang, to pump the price of the Company's ERC-20 DAG Tokens.

109.   Two of Satsgang's founders, "Bitcoin Brown" and "Lucky" actively promoted the DAG tokens on Twitter, Telegram, and other platforms.  For example, on July 30, 2019, Twitter user @bitcoin_brown – who's profile bio indicates that he is a member of the Spectre Grp – tweeted about how DAG's price chart (which was attached to the tweet) was "really impressive [over] the past month, from heavy accumulation to continuous uptrend."[25]   Notably, the "#satsGang" hashtag was used in this post promoting DAG's potential for upward price movement.[26]

---

[22]     https://www.linkedin.com/in/zac-russell-62b2a923 [Zac Russell LinkedIn profile] (last visited Oct. 18, 2021).

[23]     https://www.topionetworks.com/people/brion-hickey-5c050a7c843bac303717db03 [Brion Hickey career profile] (last visited Oct. 18, 2021).

[24]     https://constellationnetwork.io/company/about/ (last visited Oct. 18, 2021).

[25]     https://mobile.twitter.com/bitcoin_brown/status/1156111462412300289 (last visited Oct. 18, 2021).

[26]     *Id*.

110.   Similarly, on October 13, 2019, "Lucky" – a purported "cryptocurrency analyst" – also touted the "impressive returns" (*e.g.*, "600%") that DAG investors could receive "if you were patient."[27]  Lucky's bio also includes the #satsGang hashtag promotion.

111.   On January 17, 2020, Bitcoin Brown announced on Twitter that the "Bull run" was "confirmed" by Satsgang and listed several crypto-related projects including "$DAG."[28]

112.   Satsgang member, Dread Bongo, promoted Defendants' March 12, 2020 message as an "Amazing show of support to the $DAG community" on Twitter, tagging the Constellation company account and the individual Twitter accounts of Defendants Jorgensen, Goldmann, Diggles, and Meldman-Floch in this posted.[29]

113.   Constellation did not disclose that these so-called analysts and crypto community members were given massive amounts of DAG tokens and/or other consideration to promote Constellation.

114.   Defendants instead used Satsgang to engage in dubious promotion tactics to create hype around the DAG tokens, and in turn, create artificial buzz to lure in new investors.

115.   First, Defendants and Satsgang identified any possible upcoming announcements for Constellation – regardless of their significance or importance – that could be used to promote the DAG tokens they held along with Defendants.  Satsgang then exaggerated and overstated these announcements to investors in an effort to inflate the token's price.

116.   For example, with the DAG tokens, Constellation and Satsgang promoted an alleged "Partnership" the Company entered into with the United States Air Force.  In truth this

---

[27]   https://coin-turk.com/2019-yilinda-en-cok-yukselen-altcoinler?doing_wp_cron=1633566 775.3417110443115234375000; *see also* https://m.facebook.com/login.php?next=https%3A%2F%2Fm.facebook.com%2Fpages%2Fcateg ory%2FProduct-Service%2F813131545525521%2F&refsrc=deprecated&_rdr (last visited Nov. 2, 2021)

[28]   https://twitter.com/bitcoin_brown/status/1218167632484012032 (last visited Oct. 18, 2021).

[29]   https://twitter.com/dreadbong0/status/1238157818903044096?lang=en (last visited Oct. 18, 2021).

partnership was nothing more than a Phase 1 small business innovation research (SBIR) grant that over 400 other companies also received on the same day.

117.    Similarly, Constellation promoted an alleged "tier" partnership the Company supposedly entered into with Amazon Web Services ("AWS").  One investor inquired directly with AWS about this partnership with the Company, and after investigating the question, an AWS representative confirmed that "constellation labs are <u>not a tier AWS partner</u>."[30]

118.    Constellation also promoted – via Satsgang member, "Vito" – a partnership with Splunk.  On June 10, 2020, Vito wrote an article that was published on Medium, purporting to answer "a lot of questions around the unannounced Splunk x Constellation partnership" and to explain how the Company's HyperGraph Transport Protocol ("HGTP") was implicated by the partnership.[31]   This article claimed, among other things, that Constellation's HGTP was a "revolutionary piece of technology" and a "foundation layer" for Constellation.   Vito also concluded that "Even more value will be introduced with the applications built out on-top of the HGTP by the Constellation Team and others."[32]   Notably, an examination of Vito's Medium user profile reveals that the only article written by Satsgang member Vito is this one promoting a Constellation partnership.[33]

119.    Satsgang promoted these, and other similar, misleading announcements on their Telegram, Twitter, and Reddit accounts.

120.    Investors in online cryptocurrency forums described the relationship between Constellation and Satsgang (including Bitcoin Brown and Lucky) as follows:

> Constellation has 15 node operators and they get 20 MILLION DAG EACH per year!  With average dag price last 12 months that's $280,000 per satsgang member per year and $4,200,000 total per year.  Only 3-4 get paid for the tech contribution, but the rest that got this sweetheart deal from constellation are satsgang members for doing "marketing" on twitter being admins on telegram.  On top of that, they get more payment for projects like making shitty amateur videos for dag.  Satsgang are dumping hard on constellation bagholders and truly fuck them over.  All this

---

[30]     https://i.redd.it/jdi05386pr871.jpg (last visited Oct. 18, 2021) (emphasis in original).

[31]     Vito, *HyperGraph Transport Protocol*, MEDIUM.COM (June 10, 2020), https://medium.com/@armedvito/hypergraph-transport-protocol-180302fcd731.

[32]     *Id.*

[33]     *See* https://medium.com/@armedvito (last visited Oct. 18, 2021).

was admitted by constellation admins in their telegram group, but later deleted when they realized their blunder.  Normy dag bagholders are getting so fucked over by these scammers.

Most well-known satsGang members and their alt accounts are: Bitcoin Brown, Lucky, Headroom, _RN03xx_, Denny Da Rocket, papousse 47, Moonshot Josh, Steven Toast, Le Chiffre Rambo, Bazerka, FauxPho, Adouble212, Johny Zcash, Rufys, Tyler Durden, vito, Braggo, Jonny Reid, [D]read Bongo, Johnny etc., but there are more.[34]

121.    Another investor on the same thread echoed that sentiment:

One stupid satsgang mod admitted that satsgang was behind virtually all the nodes as a big thank you for their "promotional work", in reality, ass-kissing, but soon realized his error and deleted everything.  After that, anyone even hinting of asking about who's behind the nodes, selection process etc, get kicked out immeadetly.  Ordinary investors are treated like paypigs with zero rights and you have a very clear in-group and out-group division.  Everyone that is not in the dag team or satsgang belong to the out-group (paypigs)

More comedy gold from the Satsgang and Constellation's telegram channels.  Admins desperately deny that they are from Satsgang, despite every idiot can go to https://t(d0t)me/SPECTRE_GRP and see for themselves that virtually ALL their admins are from satsgang and what Ben believes is the #bestcommunityincrypto is in reality 80% satsgang pumpers&dumpers&scammer talking to each other while banning anyone that could contribute to constellation and thereby challange Satsgangs monopoly on dag handouts, as some kind of desperate welfare queens.

Satsgang admin idiots even deny that they are drowning in handouts from constellation for the "marketing" and "promotional work" aka desperate pumping and dumping, but if anyone asks about satsgang and 1,6 MILLION DAG per month nodes or if anyone can see the wallet transfers, - satsgang drama queens will instaban.  They say that Constellation paypigs are not "investors" but just some random cucks holding utility tokens with no right to ask satsgang members anything.  Gee, wonder why the price is falling like a rock and their community is shit.[35]

122.    Upon information and belief, Constellation Director Adriaan Mellegers is also the Satsgang member known as "Headroom."  Satsgang founder, Bitcoin Brown, in the following tweet from January 16, 2020, bragged about the success of "#satsgang" and tagged, upon information and belief, various Satsgang members, including one member with the handle "@dagchadheadroom." [36]

---

[34]    https://warosu.org/biz/thread/S20043499 (last visited Oct. 18, 2021).
[35]    *Id.*
[36]    https://twitter.com/bitcoin_brown/status/1217984439600533504 (last visited Oct. 18, 2021).

1
2
3
4
5
6
7
8
9
10
11
12
13



14    123.    Twitter user "@armedvito" was also tagged in this tweet as "#satsgang" member.

15    124.    That same day, an account named "Headroom.eth" responded to the Bitcoin Brown

16    tweet as follows: [37]

17
18
19
20



21
22
23

24    125.    Notably, the profile page for Adriaan Mellegers on the Medium.com website is

25    directly linked to a profile for "Headroom."[38]  Moreover, Mellegers profile has only two followers:

26

27    [37]    http://www.crossvideodays.com/hashtag/satsGang?src=hash (last visited Oct. 18, 2021).

28    [38]    Significantly, Mellegers' profile address has "@headroom" in the url.  *See* https://medium
       .com/@headroom_eth. (last visited Oct. 15, 2021).

CLASS ACTION COMPLAINT

a member named Ashish and a member named Headroom.[39]  Conversely, the Headroom profile on Medium also has only two followers: Anish and Mellegers.[40]  Finally, both the Mellegers and Headroom profiles have the same image for their respective profile pictures/avatar.



126.    Up until early October 2021, Mellegers was featured on the Constellation website as being a member of the "Constellation Core Team" and listed as the Company's "Product Designer & Director."[41]

---

[39]    *See* https://medium.com/@headroom_eth/followers (last visited Oct. 18, 2021).

[40]    *Id.*

[41]    https://web.archive.org/web/20210619074934/https://constellationnetwork.io/company/about/ (last visited Oct. 18, 2021).

## Constellation Core Team

Headquartered in San Francisco but spread across the globe, Constellation's core team is a diverse collection of passionate humans looking to change the world for the better.



**Ben Jorgensen**
CEO & CO-FOUNDER



**Wyatt Meldman-Floch**
CTO & CO-FOUNDER



**Benjamin Diggles**
CSO & CO-FOUNDER



**Mathias Goldmann**
COO & CO-FOUNDER



**Anna Dimitrova**
TECHNICAL PM



**Frank Fox**
SENIOR SOFTWARE TECH



**Christy Lai**
PRODUCT DESIGNER



**Adriaan Mellegers**
PRODUCT DESIGNER & DIRECTOR

127. Constellation's current website has scrubbed any reference to or connection with Mellegers, apparently in an attempt to distance Constellation from its association with Satsgang.

128. At least one member of Satsgang's successor Spectre Grp currently serves as an administrator of Constellation's Telegram account. Various other Satsgang members actively post in the Constellation Telegram group.

**DAG Token Swap**

129. In the months and years following Constellation's ICO, the Company posted numerous spam-like announcements on its website (*i.e.*, so-called "updates" that had little to no substance other than promises of "big" things in Constellation's future). And Satsgang amplified the noise by overly hyping these announcements as being significant catalysts for positive DAG token price movement.

130. Importantly, while Defendants were willing to provide information about relatively inconsequential events for Constellation on a monthly basis, they were conspicuously silent in the

lead up to the Token Swap.  Whatever information about the Token Swap that was provided by Defendants was either scant, incorrect, or narrowly disseminated such that it would be unlikely to be seen or acted upon by Plaintiffs and other Constellation ECR-20 DAG Token investors.

131.    For example, on December 20, 2019, Defendant Goldmann first posted the "Token Swap Information" on the Company's website, which indicated that "[t]he swap is planned for the 27th of January 2020."[42]

132.    That post also provided investors with a hyperlink to a blog by Defendant Goldmann on another non-Company website that reported information about the Token Swap.  But while the Company's own website erroneously told investors that the swap was set to occur in January 2020, the blog indicated that the swap would occur in April 2020.[43]

133.    Notably, in March 2020, the month prior to the scheduled Token Swap, Constellation's webpage provided zero official updates to investors.

134.    On March 12, 2020, the Constellation Twitter account, in response to the COVID-19 pandemic that was sweeping the globe, posted the following message: "To the #bestcommunityincrypto You are a truly amazing community and it shows especially in times like this!  Thank you!  As a team our work is not impacted.  Much of our work is decentralized anyway and we are on target with all our efforts.  Stay safe out there.  $DAG #coronavirus"[44]

135.    In April 2020, Constellation only provided a single so-called "update" to investors. In particular, on April 22, 2020, just one week before the swap was scheduled to occur, Defendant Goldmann posted a "Token Swap Update" on the Constellation website that contained virtually no information.  The entire three-sentence message is as follows:

> Token Swap – 29th April 2020 6am UTC What an amazing few years this has been as we have built an incredibly vibrant and intelligent community like no other.  WE

---

[42]    *See* Mathias Goldman, *Token Swap Information*, Constellation (Dec. 20, 2019), https://constellationnetwork.io/token-swap-information/.

[43]    *See id.*

[44]    https://twitter.com/Conste11ation/status/1238149453606838274 (last visited Oct. 18, 2021).

ARE THE FUTURE and it starts with the Mainnet Swap.  This is a historical moment for all of us and for.[45]

136.     That same day Defendant Jorgenson posted an "update" video on Constellation's YouTube page regarding the token swap.  This video was hardly viewed by the Constellation community and investors.[46]

137.     Constellation did not provide sufficient or direct communications about the Token Swap to all of its investors that purchased and held the Company's ERC-20 DAG Tokens prior to April 2020 despite having the ability to identify these investors.  In sum, Plaintiffs and other members of the class did not receive adequate notice of the Token Swap.

**The Aftermath of the Token Swap**

138.     Following the closing of the purposefully narrow window for the underpromoted Token Swap, Constellation investors who were unaware that the Token Swap had occurred slowly learned of the situation and made attempts to contact Constellation in order to participate in the Token Swap.  One of the most common methods these investors used to reach out to the Company was through the Company's official Telegram account.

139.     Constellation provided a near uniform response to all such inquiries from their investors about retroactively participating in the Token Swap.  First, Constellation/Satsgang administrators would tell ERC-20 Token investors both literally and figuratively: "you snooze you lose."  Occasionally, Constellation would elaborate by saying that there was "nothing" the Company could do.  Notably, Constellation shamelessly relayed that false statement to several of its earliest investors, who provided significant funding to Constellation for its operations.  Without these early investors, the Company could not have started and would be unable to continue operating.

---

[45]     *See* Mathias Goldman, *Token Swap Update*, Constellation (Apr. 22, 2020), https://constellationnetwork.io/2020/04/.

[46]     As of the filing of this Complaint, this video only has around 1,500 views.  Notably, Constellation's YouTube account has approximately 3,800 subscribers.  It appears then that less than half of Constellation's target audience actually saw this message about the Token Swap, even a year and a half after the video's initial posting.

140.   Next, like clockwork, Constellation would ban or block these investors from communicating with the Company further via Telegram or by email.

141.   Simultaneously, Constellation continued to use the services of Satsgang to promote DAG and artificially increase the price of its tokens even after the Token Swap.  But this promotion compounded the problems with the Token Swap.   In particular, after the Token Swap period closed, there were millions of unswapped ERC-20 DAG Tokens leftover.

142.   By refusing to grant investors' requests to participate in the Token Swap, Defendants created a secondary market for the unswapped ERC-20 DAG Tokens.  These ERC-20 DAG Tokens are currently available for trading on the various cryptocurrency exchanges and are easily confused with the Mainnet DAG Tokens as they both have the DAG/Constellation name affiliation and remain tethered to each other on the Ethereum blockchain.

143.   Furthermore, the ERC-20 DAG Tokens have a connection to the Mainnet DAG Tokens via the Company's website which is listed as the "Official Site" for the ERC-20 on Etherscan, a digital asset search platform that allows users to track and view transactions that have occurred and are recorded on the Ethereum blockchain ledger.[47]   Additionally, the Mainnet DAG Tokens are still tethered to the ERC-20 DAG Tokens on the Ethereum blockchain.

144.   Defendants could have closed out their portion of the Ethereum blockchain that used the ERC-20 DAG Tokens entirely prior to the Token Swap, or alternatively simply not tethered the ERC-20 DAG Tokens to the newly issued Mainnet DAG Tokens.  Instead, Defendants opted to allow the secondary market for the ERC-20 DAG Tokens to flourish and continue to lure in investors who end up mistakenly purchasing the worthless ERC-20 DAG Tokens.

145.   Furthermore, Defendants' continued use of Satsgang shill accounts to promote its DAG tokens after the Token Swap made it difficult for investors to understand that they should purchase the Mainnet DAG Tokens and not the ERC-20 DAG Tokens if they wanted to invest in the active Constellation network.

---

[47]       https://etherscan.io/token/0xa8258abc8f2811dd48eccd209db68f25e3e34667 (last visited Oct. 18, 2021).

146.    Constellation had and continues to have the ability and means to allow investors to participate in the Token Swap, but Defendants purposefully chose to exclude Plaintiffs and class members for their personal gain.  Constellation continues to have the ability to swap the Unused Mainnet DAG Tokens for the unswapped ERC-20 DAG Tokens but refuses to do so in order to retain their significant monetary windfall.

**Constellation Purposefully Designed and Profited from Its Improper Conduct**

147.    Constellation is fully aware that many of its investors did not receive adequate notice and thus were unable to participate in the Token Swap.  As noted above, the Company had direct contact from such investors, but instead of granting their repeated requests, Constellation rejected and silenced their investors.  By deleting comments left by their investors and banning them, Defendants were able to conceal the consequences of the Token Swap from Plaintiffs and members of the Class.

148.    Additionally, Defendants, like everyone else on the planet, were surely aware of the COVID-19 pandemic that exploded during March and April of 2020.  During the height of the pandemic, Constellation's website made zero posts in March 2020 and only one post in April 2020. To the extent Constellation sent any emails concerning the Token Swap directly to investors, this constituted only a small portion of the ERC-20 Token holders.  The majority of early investors in Constellation's ERC-20 DAG Tokens did not provide their email addresses to the Constellation team, but rather to the syndicators that were given allotments of the ERC-20 DAG Tokens to sell on Constellation's behalf.

149.    Despite the fact that ERC-20 Token investors were not given adequate notice and were preoccupied with sickness, quarantines, lockdowns, childcare, and employment issues related to the COVID-19 pandemic, Defendants purposefully chose not to delay or even extend the timing of the Token Swap.

150.    Consequently, Constellation investors were at a severe disadvantage given Defendants' chosen timing for the Token Swap.  Besides being virtually silent during the lead up to the Token Swap, Constellation used a swapping process that was so onerous and overly

1   complicated that certain investors were unable to complete the Token Swap process even while

2   the brief swap period was open.

3      151.   Constellation's conduct after the Token Swap adds another layer to an already

4   confusing situation.  Constellation's callous response to the investors that communicated with the

5   Company about their respective (yet uniform) dilemma regarding being unable to participate in

6   the Token Swap, coupled with the complete silencing of any questions about the Token Swap,

7   indicate that Defendants purposefully designed the schedule and process for the Token Swap to be

8   narrow and onerous in order to exclude investors.  Then once they had an artificially created

9   excuse, Defendants could coldly dismiss any complaints from Plaintiffs and the Class about the

10  Token Swap process while falsely pretending that there was "nothing" the Company could do to

11  make their investors whole.

12     152.   Indeed, Defendants arranged the Token Swap in order to retain the Mainnet DAG

13  Tokens that were minted for the Token Swap but were not swapped for the corresponding ERC-

14  20 DAG Tokens (the "Unused Mainnet DAG Tokens").

15     153.   Constellation misleadingly told Plaintiffs that there is "nothing" the Company can

16  do to remedy this situation.  Importantly, Constellation does not disclose what it did with the

17  Unused Mainnet DAG Tokens.  In truth, only two things could have occurred: (1) Constellation

18  "burned" the Unused Mainnet DAG Tokens, rendering them worthless; or (2) kept the Unused

19  Mainnet DAG Tokens for themselves.  Either way, Defendants benefit at the expense of Plaintiffs

20  and the Class members.  On the one hand, burning the Unused Mainnet DAG Tokens decreases

21  the overall supply of DAG tokens thereby increasing the value of Defendants' DAG holdings.  On

22  the other hand, Defendants would increase the size (and corresponding value) of their DAG

23  holdings by simply taking the Unused Mainnet DAG Tokens for themselves.

24     154.   Constellation's suggestions of futility and statements that there is nothing it can do

25  are false.

26     155.   Because Constellation can identify the eligible investors who did not participate in

27  the Token Swap and may in fact still have the Unused Mainnet DAG Tokens in its possession,

28  Constellation could simply open up the Token Swap period again.  Constellation has set aside

hundreds of millions of Mainnet DAG tokens to be given as rewards for network participants for their contribution to the network.  Alternatively, Constellation could mint new, replacement tokens for any that were burned.

156.    On information and belief, Constellation – a highly sophisticated participant in the technology industry which monitors and tracks large data sets and sources – possesses other means and technology to determine which holders of ERC-20 DAG Tokens purchased those tokens prior to April 29, 2020.

157.    Despite such means and technology, Constellation uniformly and consistently informs investors there is nothing that Constellation can do now that the Token Swap period has expired.  Constellation knows that representation is false.

158.    Constellation's actions regarding the Token Swap, as set forth above, are intentional and done for the purpose of increasing the size and/or value of Defendants' DAG holdings at the expensive of investors.  This served Defendants' larger goal of being able to recoup a portion of the Company's ICO funding that had been squandered by Defendant Playford.

159.    Simultaneously, Defendants' promotional activities with Satsgang have misled new investors into buying the unswapped ERC-20 DAG Tokens that are still available for purchase on various decentralized cryptocurrency exchanges and are still associated with the Mainnet DAG Tokens.

160.    As a direct and proximate result of Constellation's conduct, misrepresentations, and omissions described herein, Plaintiffs and Class members suffered damages including the amount of the value of what the ERC-20 DAG Tokens would be worth had they been swapped for the Mainnet DAG Tokens as part of the Token Swap.

161.    In sum, Defendants fall far short of their stated goal of building a world where "truth is apparent, power is fairly distributed and reputation matters."[48]

---

[48]    Press Release, *Constellation Network Chooses LCX as Partner* (Mar. 28, 2021), https://www.prnewswire.com/news-releases/constellation-network-chooses-lcx-as-partner-301257193.html#:~:text=SAN%20FRANCISCO%2C%20March%2028%2C%202021,fintech%20company%20headquartered%20in%20Liechtenstein.

**TOLLING OF STATUTES OF LIMITATIONS**

162.     Plaintiffs and the Class members had no way of knowing about Defendants' conduct with respect to Defendant Playford's conduct and Defendants' response thereto.

163.     Neither Plaintiffs nor any members of the Class, through the exercise of reasonable diligence, could have discovered the conduct alleged herein.  Further, Plaintiffs and members of the Class did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

164.     For these reasons all applicable statutes of limitations have been tolled by discovery rule with respect to the claims asserted by Plaintiffs and the Class.

165.     Additionally, by failing to disclose the circumstances surrounding Defendant Playford's departure and Defendants' strategic responses thereto, Defendants concealed their conduct and the existence of the claims asserted herein from Plaintiffs and the members of the Class.

166.     Upon information and belief, Defendants intended their acts to conceal the facts and claims from Plaintiffs and members of the Class.  Plaintiffs and the members of the Class were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct.  For this additional reason, any statute of limitations that otherwise may apply to the claims of Plaintiffs or members of the Class should be tolled.

**CLASS ALLEGATIONS**

167.     Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased Constellation's ERC-20 DAG Tokens and were subsequently barred by Defendants from swapping the ERC-20 DAG Tokens to the Mainnet DAG Tokens.

168.     The Class Period is defined as the period between January 1, 2017 and the commencement of this action.[49]

---

[49]     Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

169.    Excluded from the Class are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers and directors; (c) Plaintiffs' counsel and Defendant's counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

170.    **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable.  While the exact number and identity of individual members of the Class is unknown at this time, such information being in the sole possession of Constellation and/or third parties and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that the Class consists of at least hundreds of people.  The number of Class members can be determined based on Constellation's and other third party's records.

171.    **Commonality**: Common questions of law and fact exist as to all members of each Class.  These questions predominate over questions affecting individual Class members.  These common legal and factual questions include, but are not limited to:

a.    whether Constellation failed to inform investors about the circumstances involving Defendant Playford's departure as CEO and what was done with the $33.7 million raised in the Company's ICO;

b.    whether Constellation improperly engaged online promoters to misleadingly market DAG tokens;

c.    whether Defendants purposefully created a process for the Token Swap that was onerous and could only occur during a limited time in order to exclude as many ERC-20 DAG Token holders as possible from swapping those tokens for the Unused Mainnet DAG Tokens;

d.    whether Constellation provided inadequate notice of the Token Swap to ERC-20 DAG Token investors;

e.    whether Constellation misrepresents that there is nothing that Constellation can do for investors wanting to swap ERC-20 DAG Tokens for Mainnet DAG Tokens after the DAG token swap period ended;

f.      whether Constellation burned the Unswapped Mainnet DAG Tokens;

g.      whether Constellation's conduct violates the state consumer protection statutes asserted herein;

h.      whether Constellation has been unjustly and wrongfully enriched as a result of its conduct;

i.      whether money and/or value of the Mainnet DAG Tokens that the Company obtained as a result of the token swap rightfully belongs to Plaintiffs and Class members;

j.      whether Constellation should be required to return money it received as a result of the Token Swap to Plaintiffs and Class members;

k.      whether Constellation breached the implied covenant of good faith and fair dealing; and

l.      whether Plaintiffs have suffered damages, and, if so, the nature and extent of those damages.

172.    **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members.    Plaintiffs' and Class members' claims all arise out Constellation's uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the DAG Token Swap.

173.    **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class and are committed to pursuing this action vigorously.  Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation.  Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

174.    **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class.  The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Constellation's conduct.  It would be virtually impossible for individual Class members to effectively redress the wrongs done

1   to them.  Even if Class members could afford individualized litigation, the court system could not.

2   Individualized litigation would increase delay and expense to all parties, and to the court system,

3   because of the complex legal and factual issues of this case.  Individualized rulings and judgments

4   could result in inconsistent relief for similarly situated individuals.  By contrast, the class action

5   device presents far fewer management difficulties, and provides the benefits of single adjudication,

6   economy of scale, and comprehensive supervision by a single court.

7       175.    Defendants have acted or refused to act on grounds generally applicable to the

8   Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with

9   respect to the Class as a whole.

10              **CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS**

11      176.    California's substantive laws apply to every member of the Class, regardless of

12  where in the United States the Class members reside.

13      177.    California's substantive laws may be constitutionally applied to the claims of

14  Plaintiffs and the Class under the Due Process Clause, 14th Amend. §1, and the Full Faith and

15  Credit Clause, Art. IV §1 of the U.S. Constitution.  California has significant contact, or significant

16  aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating

17  state interests that ensure that the choice of California state law is not arbitrary or unfair.

18      178.    Constellation's headquarters and principal place of business is located in

19  California.   Upon information and belief, Constellation also owns property and conducts

20  substantial business in California, and therefore California has an interest in regulating

21  Constellation's conduct under its laws.  Constellation's decision to reside in California and avail

22  itself of California's laws, and to engage in the challenged conduct from and emanating out of

23  California, renders the application of California law to the claims herein constitutionally

24  permissible.

25      179.    California is also the state from which Constellation's alleged misconduct

26  emanated.  On information and belief, the decision-making regarding the parameters of DAG

27  Token Swap and the subsequent response thereto, occurred in and emanated from California.  As

28

1  such, the conduct complained of herein emanated from California.  This conduct similarly injured

2  and affected Plaintiffs and all other Class members.

3       180.   The application of California laws to the Class is also appropriate under

4  California's choice of law rules because California has significant contacts to the claims of

5  Plaintiffs and the proposed Class, and California has a greater interest in applying its laws here

6  than any other interested state.

7                    **FIRST CAUSE OF ACTION**
                    **Violation of the California Unfair Competition Law**
8                    **Cal. Bus. & Prof. Code §17200**
                    **(On Behalf of the Nationwide Class)**
9

10      181.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth

11  herein.

12      182.   Plaintiffs Hansu Chu, Hio Fong Mak, Robert Como, Anthony DeGol, Philippe Lee,

13  Daniel Riceberg, Taylor Paur, Roger Lu, Jesse Smithnosky, Matt Szymaszek, and Zaheer Ahmed

14  are residents of the State of California.

15      183.   At all relevant times there was in full force and effect the California Unfair

16  Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, which prohibits, *inter alia*,

17  "any unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or

18  misleading advertising."

19      184.   Constellation also engaged in business acts and practices deemed "unfair" under

20  the UCL, because the conduct, statements, and omissions described above, and by knowingly and

21  intentionally creating an unreasonably onerous and short process to participate in the DAG Token

22  Swap, and by knowingly and intentionally retaining and/or burning the Mainnet DAG Tokens that

23  were specifically minted for the DAG Token Swap.  Unfair acts under the UCL have been

24  interpreted using different tests, including : (1) whether the public policy which is a predicate to a

25  consumer unfair competition action under the unfair prong of the UCL is tethered to specific

26  constitutional, statutory, or regulatory provisions; (2) whether the gravity of the harm to the

27  consumer caused by the challenged business practice outweighs the utility of the defendant's

28  conduct; and (3) whether the consumer injury is substantial, not outweighed by any countervailing

1 benefits to consumers or competition, and is an injury that consumers themselves could not

2 reasonably have avoided.  Defendant's conduct is unfair under each of these tests.

3      185.    As a direct and proximate result of Constellation's unlawful, unfair, and deceptive

4 practices, Plaintiffs and Class members suffered damages.  Constellation's activities with Satsgang

5 and the Token Swap and concealment of the financial impact that the loss of the ICO funding due

6 to Defendant Playford's misappropriation had on the Company caused Plaintiffs and the Class

7 members to purchase and/or hold the ERC-20 DAG Tokens when they otherwise would not have

8 done so.

9      186.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices

10 by Constellation, to obtain restitution and disgorgement of all monies generated as a result of such

11 practices, and for all other relief allowed under California Business & Professions Code section

12 17200.

13      187.    Plaintiffs specifically seek restitution in the form of either (1) a one-for-one swap

14 of their ERC-20 DAG Tokens with the Unused Mainnet DAG Tokens; or (2) the monetary value

15 of the difference between the purchase price of the ERC-20 DAG Tokens and the price of the

16 Mainnet DAG Tokens at the time of the filing of this action.

17 **SECOND CAUSE OF ACTION**
**Violation of the California Consumers Legal Remedies Act**
18 **Cal. Code Civ. Proc. §1770**
**(On behalf of the Nationwide Class)**
19

20      188.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth

21 herein.

22      189.    Plaintiffs Hansu Chu, Hio Fong Mak, Robert Como, Anthony DeGol, Philippe Lee,

23 Daniel Riceberg, Taylor Paur, Roger Lu, Jesse Smithnosky, Matt Szymaszek, and Zaheer Ahmed

24 are residents of the State of California.

25      190.    At all relevant times there was in full force and effect Cal. Civil. Code §1770, which

26 prohibits, *inter alia*, various methods of "unfair or deceptive acts or practices undertaken by any

27 person in a transaction intended to result or that results in the sale or lease of goods or services to

28 any consumer," including, but not limited to, "[m]isrepresenting the affiliation, connection, or

association with, or certification by, another" and "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have." Cal. Civil Code §1770(a)(3) & (5).

191.    Constellation engaged in business acts and practices deemed "deceptive" because of the conduct, statements, and omissions described above, including, but not limited to, the following:

(a)    knowingly and intentionally concealing the circumstances involving Defendant Playford and his misuse of the $33.7 million raised in the Constellation ICO;

(b)    knowingly and intentionally using and/or failing to disclose the use of Satsgang online promotors to exaggerate the importance of various Company announcements, including but not limited to, so-called partnerships with the United States Air Force and Amazon Web Services, in an effort to manipulate and artificially inflate the price of the DAG tokens;

(c)    knowingly and intentionally creating an unreasonably onerous, short, and underpromoted process to participate in the DAG Token Swap in order to exclude as many ERC-20 DAG Token investors as possible and retain any unswapped Mainnet DAG Tokens; and

(d)    intentionally or recklessly creating a secondary market for the unswapped ERC-20 DAG Tokens and failing to adequately warn investors against purchasing the unswapped ERC-20 DAG Tokens instead of the Mainnet DAG Tokens.

192.    As a direct and proximate result of Constellation's unlawful, unfair, and deceptive practices, Plaintiffs and Class members suffered damages.  Constellation's activities caused Plaintiffs and the Class members to purchase and/or retain the ERC-20 DAG Tokens when they otherwise would not have done so.

193.    Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Constellation, to obtain restitution and disgorgement of all monies generated as a result of such practices, and for all other relief allowed under Cal. Civil Code §1780.

194.    Plaintiffs specifically seek restitution in the form of either (1) a one-for-one swap of their ERC-20 DAG Tokens with the Unused Mainnet DAG Tokens; or (2) the monetary value of the difference between the purchase price of the ERC-20 DAG Tokens and the price of the Mainnet DAG Tokens at the time of the filing of this action.

195.    Plaintiffs additionally seek punitive damages under Cal. Civil Code §1770(a)(4).

196.    Plaintiffs have complied with Cal. Civil Code §1780(d), which requires the concurrent filing of an "affidavit stating facts showing that the action has been commenced in a county described in this section as a proper place for the trial of the action."

**THIRD CAUSE OF ACTION**
**Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Ch. 501, §211(1), Fla. Stat. Ann.**
**(On behalf of the Nationwide Class)**

197.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

198.    Plaintiff Matthew Holye is a resident of the State of Florida.

199.    Chapter 501, Fla. Stat., FDUTPA is to be liberally construed to protect the consuming public, such as Plaintiffs in this case, from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce.

200.    Plaintiffs are "consumers" within the meaning of Fla. Stat. §501.203(7).

201.    By soliciting investor funds in the manner in which they did, Defendants engaged in "trade and commerce" within the meaning of Fla. Stat. §501.203(8).

202.    While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission's interpretations of these terms. The FTC has found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

203.    The federal courts have defined a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers and have defined an "unfair trade practice"

1    as any act or practice that offends public policy and is immoral, unethical, oppressive,
2    unscrupulous, or substantially injurious to consumers.

3      204. Defendants' deceptive and unfair trade practices include, but are not limited to, the
4    following acts and omissions:

5      (a) knowingly and intentionally concealing the circumstances involving Defendant
6        Playford and his misuse of the $33.7 million raised in the Constellation ICO;

7      (b) knowingly and intentionally using and/or failing to disclose the use of Satsgang
8        online promotors to exaggerate the importance of various Company
9        announcements, including but not limited to, so-called partnerships with the United
10       States Air Force and Amazon Web Services, in an effort to manipulate and
11       artificially inflate the price of the DAG tokens;

12     (c) knowingly and intentionally creating an unreasonably onerous, short, and
13       underpromoted process to participate in the DAG Token Swap in order to exclude
14       as many ERC-20 DAG Token investors as possible and retain any unswapped
15       Mainnet DAG Tokens; and

16     (d) intentionally or recklessly creating a secondary market for the unswapped ERC-20
17       DAG Tokens and failing to adequately warn investors against purchasing the
18       unswapped ERC-20 DAG Tokens instead of the Mainnet DAG Tokens.

19     205. These acts and omissions constitute both deceptive and unfair trade practices
20   because the false representations and omissions made by Defendants have a tendency or capacity
21   to deceive consumers, such as Plaintiffs, into investing in the ERC-20 DAG Tokens and refusing
22   to exchange the unswapped Mainnet Tokens (which were minted precisely for a 1-to-1 swap of
23   available ERC-20 DAG Tokens) is immoral, unethical, oppressive, unscrupulous, or substantially
24   injurious to consumers.

25     206. As a result of Defendants' deceptive trade practices, Plaintiffs were deceived into
26   retaining functionally worthless cryptocurrencies and/or investing their cryptocurrency and/or fiat
27   currency with a company that functioned solely as an engine of fraud -- thus causing significant
28   economic damage to Plaintiffs.

207.    The materially false statements and omissions as described above, and the fact that this was a misleading investment, were unfair, unconscionable, and deceptive practices perpetrated on Plaintiffs which would have likely deceived a reasonable person under the circumstances.

208.    Defendants were on notice at all relevant times that the false representations of material facts described above were being communicated to prospective investors (such as Plaintiffs) by their authorized agents.

209.    As a result of the false representations and violations of the laws described above, Plaintiffs have been damaged by, among other things losing the true value of their invested cryptocurrency.

210.    Plaintiffs have also been damaged in other and further ways subject to proof at trial.

211.    Therefore, Defendants engaged in unfair and deceptive trade practices in violation of Florida Statute Section 501.201, *et seq*.

212.    Plaintiffs specifically seek restitution in the form of either (1) a one-for-one swap of their ERC-20 DAG Tokens with the Unused Mainnet DAG Tokens; or (2) the monetary value of the difference between the purchase price of the ERC-20 DAG Tokens and the price of the Mainnet DAG Tokens at the time of the filing of this action.

213.    Pursuant to Florida Statute Sections 501.211(1) and 501.2105, Plaintiffs are entitled to recover from Defendants the reasonable amount of attorneys' fees Plaintiffs have had to incur in representing their interests in this matter.

## FOURTH CAUSE OF ACTION
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 Ill. Comp. Stat. Ann. 505**
**(On behalf of the Nationwide Class)**

214.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

215.    Plaintiffs Timothy Barany and Scott Bohlman are residents of the State of Illinois.

216.    The ERC-20 DAG Tokens are commodities and thus constitute "merchandise" under ILCS 505/1(b).

217.    Plaintiffs are "consumers" within the meaning of ILCS 505/1(e).

218.   Defendants engaged in "unfair or deceptive acts or practices" to the detriment of Plaintiffs as that term is defined by Section 505/2 of the Illinois Consumer Fraud and Deceptive Business Practices Act by Defendants' use or employment of deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, including but not limited to, in the following ways:

(a)   by knowingly and intentionally concealing the circumstances involving Defendant Playford and his misuse of the $33.7 million raised in the Constellation ICO;

(b)   by knowingly and intentionally using and/or failing to disclose the use of Satsgang online promotors to exaggerate the importance of various Company announcements, including but not limited to, so-called partnerships with the United States Air Force and Amazon Web Services, in an effort to manipulate and artificially inflate the price of the DAG tokens;

(c)   by knowingly and intentionally creating an unreasonably onerous, short, and underpromoted process to participate in the DAG Token Swap in order to exclude as many ERC-20 DAG Token investors as possible and retain any unswapped Mainnet DAG Tokens; and

(d)   by intentionally or recklessly creating a secondary market for the unswapped ERC-20 DAG Tokens and failing to adequately warn investors against purchasing the unswapped ERC-20 DAG Tokens instead of the Mainnet DAG Tokens.

219.   Plaintiffs have been economically damaged thereby and, as such, are entitled to actual damages pursuant to ISCL 505/10a.

220.   Plaintiffs specifically seek restitution in the form of either (1) a one-for-one swap of their ERC-20 DAG Tokens with the Unused Mainnet DAG Tokens; or (2) the monetary value of the difference between the purchase price of the ERC-20 DAG Tokens and the price of the Mainnet DAG Tokens at the time of the filing of this action.

221.   Plaintiffs additionally seek reasonable attorney's fees and costs pursuant to ICLS 505/10a(c).

222.   This action is properly before this Court since "[s]uch action may commenced in the county in which the person against whom it is brought resides, has his principal place of business, or is doing business, or in the county where the transaction or any substantial portion thereof occurred."  ISCL 505/10a(b).

**FIFTH CAUSE OF ACTION**
**Violations of the Nevada Consumer Fraud laws**
**N.R.S. 41.6000**
**(On behalf of the Nationwide Class)**

223.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

224.   Plaintiffs Sean Getzwiller, Jeffrey Sluzinski, Todd Spafford, and Daniel Freeman are residents and citizens of the State of Nevada.

225.   At all relevant times there was in full force and effect N.R.S. 41.600, which provides that "[a]n action may be brought by any person who is a victim of consumer fraud." N.R.S. 41.600(1).   "Consumer fraud" is defined as, among other things, a "deceptive trade practice" enumerated under N.R.S. 598.0923. *See* N.R.S. 41.600(1)(e).   According to Section 598.0915, a person engages in a "deceptive trade practice" when, in the course of business, the person, inter alia, knowingly uses "an unconscionable practice" or "coercion, duress or intimidation" in a transaction.  N.R.S. 41.600(1)(d)-(e).

226.   Defendants engaged in an "unconscionable practice" to the detriment of Plaintiffs as that term is defined by Section 41.600(2)(b) of the Nevada Revised Statutes, by (1) taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree and (2) arbitrarily or unfairly excluding the access of Plaintiffs to a good or service, including but not limited to, in the following ways:

(a)   by knowingly and intentionally concealing the circumstances involving Defendant Playford and his misuse of the $33.7 million raised in the Constellation ICO from investors;

(b)   by knowingly and intentionally using and/or failing to disclose the use of Satsgang online promotors to exaggerate the importance of various Company

announcements, including but not limited to, so-called partnerships with the United States Air Force and Amazon Web Services, in an effort to manipulate and artificially inflate the price of the DAG tokens;

(c)  by knowingly and intentionally creating an unreasonably onerous, short, and underpromoted process to participate in the DAG Token Swap in order to unfairly exclude as many ERC-20 DAG Token investors as possible from accessing the DAG Token Swap in order to retain any unswapped Mainnet DAG Tokens; and

(d)  by intentionally or recklessly creating a secondary market for the unswapped ERC-20 DAG Tokens and failing to adequately warn investors against purchasing the unswapped ERC-20 DAG Tokens instead of the Mainnet DAG Tokens.

227.    Defendants' acts and omissions are deemed deceptive under N.R.S. 41.600(2)(b)(1) and (3).

228.    As a direct and proximate result of Constellation's unfair and deceptive practices, Plaintiffs and Class members suffered damages.  Constellation's activities caused Plaintiffs and the Class members to purchase and/or retain the ERC-20 DAG Tokens when they otherwise would not have done so.

229.    Plaintiffs specifically seek restitution in the form of either (1) a one-for-one swap of their ERC-20 DAG Tokens with the Unused Mainnet DAG Tokens; or (2) the monetary value of the difference between the purchase price of the ERC-20 DAG Tokens and the price of the Mainnet DAG Tokens at the time of the filing of this action.  N.R.S. 41.600(3)(a)-(b).

230.    Pursuant to Sections 41.600(3)(c) of the Nevada Revised Statutes, Plaintiffs are also entitled to recover from Defendants the reasonable amount of attorneys' fees and costs Plaintiffs have had to incur in representing their interests in this matter.

**SIXTH CAUSE OF ACTION**
**Violation of New York's General Business Law**
**Art. 22-A, §349, *et seq*.**
**(On behalf of the Nationwide Class)**

231.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

232.    Plaintiffs David Lee, Ete Adote, William Ayers, and Douglas Schadewald are residents of the State of New York.

233.    For the reasons discussed herein, Defendants violated and continued to violate Section 349(a) of the New York General Business Law by engaging in the herein described unfair or deceptive acts or practices. Defendants acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

234.    Defendants engaged in deceptive acts and practices under New York law by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a)    by knowingly and intentionally concealing the circumstances involving Defendant Playford and his misuse of the $33.7 million raised in the Constellation ICO;

(b)    by knowingly and intentionally using and/or failing to disclose the use of Satsgang online promotors to exaggerate the importance of various Company announcements, including but not limited to, so-called partnerships with the United States Air Force and Amazon Web Services, in an effort to manipulate and artificially inflate the price of the DAG tokens;

(c)    by knowingly and intentionally creating an unreasonably onerous, short, and underpromoted process to participate in the DAG Token Swap in order to exclude as many ERC-20 DAG Token investors as possible and retain any unswapped Mainnet DAG Tokens; and

1     (d)    by intentionally or recklessly creating a secondary market for the unswapped ERC-

2            20 DAG Tokens and failing to adequately warn investors against purchasing the

3            unswapped ERC-20 DAG Tokens instead of the Mainnet DAG Tokens.

4     235.    As a direct and proximate result of Constellation's unfair and deceptive practices,

5  Plaintiffs and Class members suffered damages.  Constellation's activities caused Plaintiffs and

6  the Class members to purchase and/or retain the ERC-20 DAG Tokens when they otherwise would

7  not have done so.

8     236.    Pursuant to GBL §349(h), Plaintiffs seek restitution of the actual damages suffered

9  by Plaintiffs and the Class in the form of either (1) a one-for-one swap of their ERC-20 DAG

10  Tokens with the Unused Mainnet DAG Tokens; or (2) the monetary value of the difference

11  between the purchase price of the ERC-20 DAG Tokens and the price of the Mainnet DAG Tokens

12  at the time of the filing of this action.

13     237.    In addition, Plaintiffs are entitled to reasonable attorney's fees and exemplary

14  damages not exceeding three times the value of the consideration given by the consumer, and any

15  other relief this Court determined is appropriate.  *See* GBL §349(h).

16                         **<u>SEVENTH CAUSE OF ACTION</u>**
**Violation of the Texas Deceptive Trade Practices Act ("TDTPA")**

17               **Tex. Business and Commerce Code, Tit. 2, Ch. 17, §17.41, *et seq*.**
**(On behalf of the Nationwide Class)**

18

19     238.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth

20  herein and further allege the following:

21     239.    Plaintiffs Matthew Farmer and Ian Johns are residents and citizens of the State of

22  Texas.

23     240.    Plaintiffs and the Class intend to assert a claim under the TDTPA against

24  Defendants.  Plaintiffs intend to provide Defendant written notice of the specific complaint and

25  damages to Defendants in accordance with the Tex. Bus. & Commerce Code §17.505.  Subject to

26  the response, if any, by Defendants within 60 days of the notice, Plaintiffs, on behalf of themselves

27  and the Classes, shall amend the Complaint to include this Claim for Relief and demand all

28  appropriate relief under the TDTPA.

241.   Plaintiffs Matthew Farmer and Ian Johns are residents of the State of Texas.

242.   At all material times, Defendant Constellation engaged in "trade" and "commerce" as defined by the TDTPA.

243.   Plaintiffs are "consumers" as defined by Section 17.45(4) of the Tex. Bus. & Commerce Code.

244.   For the reasons discussed herein, Defendants violated and continued to violate the TDTPA by engaging in the herein described unconscionable, deceptive, unfair acts or practice proscribed by the TDTPA.   Defendants acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

245.   Defendants engaged in an "unconscionable action or course of action" to the detriment of Plaintiffs as that term is defined by Section 17.45(5) of the Tex. Bus. & Commerce Code, by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a)   by knowingly and intentionally concealing the circumstances involving Defendant Playford and his misuse of the $33.7 million raised in the Constellation ICO;

(b)   by knowingly and intentionally using and/or failing to disclose the use of Satsgang online promotors to exaggerate the importance of various Company announcements, including but not limited to, so-called partnerships with the United States Air Force and Amazon Web Services, in an effort to manipulate and artificially inflate the price of the DAG tokens;

(c)   by knowingly and intentionally creating an unreasonably onerous, short, and underpromoted process to participate in the DAG Token Swap in order to exclude as many ERC-20 DAG Token investors as possible and retain any unswapped Mainnet DAG Tokens; and

(d)   by intentionally or recklessly creating a secondary market for the unswapped ERC-20 DAG Tokens and failing to adequately warn investors against purchasing the unswapped ERC-20 DAG Tokens instead of the Mainnet DAG Tokens.

246.   Defendants' acts and omissions are deemed deceptive under Tex. Bus. & Commerce Code §17.46(b)(5), (12) & (24), thereby entitling Plaintiffs to relief pursuant to §17.50(a)(1) & (3).

247.   Pursuant to Tex. Bus. & Commerce Code §17.50(b)(3), Plaintiffs seek restitution in the form of either (1) a one-for-one swap of their ERC-20 DAG Tokens with the Unused Mainnet DAG Tokens; or (2) the monetary value of the difference between the purchase price of the ERC-20 DAG Tokens and the price of the Mainnet DAG Tokens at the time of the filing of this action.

248.   In addition, pursuant to Tex. Bus. & Commerce Code §17.50(b)(1), Plaintiffs are entitled to economic damages, costs, attorney's fees, additional damages up to three times actual damages, and any other relief this Court determines is appropriate.

**EIGHTH CAUSE OF ACTION**
**Violations of Vermont's Consumer Protection laws**
**Vt. Stat. Ann. tit. 9, §2451, *et seq*.**
**(On behalf of the Nationwide Class)**

249.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

250.   Plaintiff Stephen Marshall is a resident of the State of Vermont.

251.   At all material times, Defendant Constellation was a "seller" as defined by 9 V.S.A. §2451a(3).

252.   Plaintiffs are "consumers" as defined by 9 V.S.A. §2451a(1).

253.   The ERC-20 DAG Tokens constitute "goods" or "services" under 9 V.S.A. §2451a(2).

254.   For the reasons discussed herein, Defendants violated and continued to violate the Vermont's consumer protection laws by engaging in the herein described unfair or deceptive acts or practices.  Defendants acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

255.   "Whether an act is 'unfair' is guided by consideration of several factors, including (1) whether the act offends public policy, (2) whether it is immoral, unethical, oppressive or unscrupulous, and (3) whether it causes substantial injury to consumers." *See Drake v. Allergan, Inc.*, 63 F. Supp. 3d 382, 393 (D. Vt. 2014).

256.   Defendants engaged in an "immoral, unethical, oppressive and unscrupulous" conduct that offends public policy and causes injury to consumers like Plaintiffs, by taking advantage of the lack of knowledge, ability, experience, or capacity of Plaintiffs to a grossly unfair degree, including but not limited to, in the following ways:

(a)   by knowingly and intentionally concealing the circumstances involving Defendant Playford and his misuse of the $33.7 million raised in the Constellation ICO;

(b)   by knowingly and intentionally using and/or failing to disclose the use of Satsgang online promotors to exaggerate the importance of various Company announcements, including but not limited to, so-called partnerships with the United States Air Force and Amazon Web Services, in an effort to manipulate and artificially inflate the price of the DAG tokens;

(c)   by knowingly and intentionally creating an unreasonably onerous, short, and underpromoted process to participate in the DAG Token Swap in order to exclude as many ERC-20 DAG Token investors as possible and retain any unswapped Mainnet DAG Tokens; and

(d)   by intentionally or recklessly creating a secondary market for the unswapped ERC-20 DAG Tokens and failing to adequately warn investors against purchasing the unswapped ERC-20 DAG Tokens instead of the Mainnet DAG Tokens.

257.   Pursuant to 9 V.S.A. §2461(b), Plaintiffs seek restitution in the form of either (1) a one-for-one swap of their ERC-20 DAG Tokens with the Unused Mainnet DAG Tokens; or (2) the monetary value of the difference between the purchase price of the ERC-20 DAG Tokens and the price of the Mainnet DAG Tokens at the time of the filing of this action.

258.   In addition, pursuant to 9 V.S.A. §2461(b), Plaintiffs are entitled to reasonable attorney's fees and exemplary damages not exceeding three times the value of the consideration given by the consumer, and any other relief this Court determined is appropriate.

**NINTH CAUSE OF ACTION**
**Violation of Washington's Consumer Protection Act**
**Rev. Code Wash. Ann. tit. 19, Ch. 19.86, *et seq*.**
**(On behalf of the Nationwide Class)**

259.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

260.   Plaintiff Ralph Porter is a resident of the State of Washington.

261.   The ERC-20 DAG Tokens are "assets within the meaning of RCWA 19.86.010(3).

262.   Plaintiffs are "persons" within the meaning of RCWA 19.86.010(1).

263.   Under Washington's Consumer Protection Act, a private civil action for unfair or deceptive acts or practices that were injurious to the public interest can be established when, among other things, the act or practice: (a) injured other persons; (b) had the capacity to injure other persons; or (c) has the capacity to injure other persons.  RCWA 19.86.093(3).

264.   Defendants engaged in "unfair or deceptive acts or practices" that were, and continued to be, injurious to the public interest under RCWA 19.86.020 and 19.86.093 through Defendants' use or employment of deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, including but not limited to, in the following ways:

(a)   by knowingly and intentionally concealing the circumstances involving Defendant Playford and his misuse of the $33.7 million raised in the Constellation ICO;

(b)   by knowingly and intentionally using and/or failing to disclose the use of Satsgang online promotors to exaggerate the importance of various Company announcements, including but not limited to, so-called partnerships with the United States Air Force and Amazon Web Services, in an effort to manipulate and artificially inflate the price of the DAG tokens;

(c)     by knowingly and intentionally creating an unreasonably onerous, short, and underpromoted process to participate in the DAG Token Swap in order to exclude as many ERC-20 DAG Token investors as possible and retain any unswapped Mainnet DAG Tokens; and

(d)     by intentionally or recklessly creating a secondary market for the unswapped ERC-20 DAG Tokens and failing to adequately warn investors against purchasing the unswapped ERC-20 DAG Tokens instead of the Mainnet DAG Tokens.

265.    As a direct and proximate result of Constellation's unfair and deceptive practices, Plaintiffs and Class members suffered damages.  Constellation's activities caused Plaintiffs and the Class members to purchase and/or retain the ERC-20 DAG Tokens when they otherwise would not have done so.

266.    Plaintiffs have been economically damaged thereby and, as such, are entitled to actual damages pursuant to RCWA 19.86.090.

267.    Plaintiffs specifically seek restitution in the form of either (1) a one-for-one swap of their ERC-20 DAG Tokens with the Unused Mainnet DAG Tokens; or (2) the monetary value of the difference between the purchase price of the ERC-20 DAG Tokens and the price of the Mainnet DAG Tokens at the time of the filing of this action.

268.    In addition, pursuant to RCWA 19.86.090 Plaintiffs are entitled to costs, attorney's fees, additional damages up to three times actual damages, and any other relief this Court determines is appropriate.

**TENTH CAUSE OF ACTION**
**Unjust Enrichment/Restitution**
**(In the Alternative)**
**(On behalf of the Nationwide Class)**

269.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

270.    Plaintiffs and members of the Class conferred a monetary benefit on Constellation as a result of being excluded from participating in the DAG Token Swap.

271.   Defendants received a benefit in the form of either their continued retention of the Unused Mainnet DAG Tokens or the value of the corresponding increase in the value of their respective DAG Token holdings if Defendants in fact burned the Unused Mainnet DAG Tokens, and are in possession of this monetary value that was intended to be used for the benefit of, and rightfully belongs to, Plaintiffs and members of the Class.

272.   Plaintiffs and the Class were precluded from participating in the DAG Token Swap by Defendants, who, in turn, received an inappropriate windfall.

273.   Plaintiffs seek restitution in the form of either (1) a one-for-one swap of the ERC-20 DAG Tokens with the Unused Mainnet DAG Tokens; or (2) the monetary value of the difference between the purchase price of the ERC-20 DAG Tokens and the price of the Mainnet DAG Tokens at the time of the filing of this action.

**ELEVENTH CAUSE OF ACTION**
**Declaratory Judgment**
**28 U.S.C. §2201**
**(On Behalf of the Nationwide Class)**

274.   Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

275.   Under the Declaratory Judgment Act, 28 U.S.C. §2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and that violate the terms of the California state statutes described in this complaint.

276.   Plaintiffs seek a declaration of the rights of the parties under the Federal Declaratory Judgement Act, 28 U.S.C. §2201.

277.   An actual and justiciable controversy exists between the parties in light of Defendants' (1) misrepresenting that there was nothing that they can do when Plaintiffs contacted Constellation to report that they were unable to participate in the DAG Token Swap; (2) failing to disclose that Constellation can identify the owners of the unswapped ERC-20 DAG Tokens; and

1   (3) refusing to allow Plaintiffs and the Class to swap their eligible ERC-20 DAG Tokens for

2   Mainnet DAG Tokens.

3       278.    Plaintiffs and Class members lack an adequate remedy at law.

4       279.    Constellation cannot, as a matter of law, disclaim or assign the liability of loss,

5   conversion, or destruction of the value of the Unused Mainnet DAG Tokens when Constellation

6   knows that the ERC-20 DAG Tokens were eligible to participate in the DAG Token Swap,

7   Constellation purposefully created an extremely narrow window under onerous conditions for

8   ERC-20 DAG Token holders to swap their tokens, Constellation purposefully and repeatedly

9   refuses to allow Plaintiffs and the Class to swap their ERC-20 DAG Tokens for the Unused

10   Mainnet DAG Tokens that were minted specifically for that purpose, and Constellation knowingly

11   did all this to retain the value of the Unused Mainnet DAG Tokens at the expense of Plaintiffs and

12   Class members.

13       280.    Constellation's attempt to disclaim liability is unconscionable and unenforceable

14   as to Plaintiffs and Class members, and Plaintiffs seek a declaration to that effect.

15   **PRAYER FOR RELIEF**

16       WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated,

17   respectfully request that this Court:

18       A.    Determine that the claims alleged herein may be maintained as a class action under

19   Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the

20   Classes defined above;

21       B.    Appoint Plaintiffs as the representatives of the Class and their counsel as Class

22   counsel;

23       C.    Award all actual, general, special, incidental, statutory, punitive, and consequential

24   damages and restitution to which Plaintiffs and the Class members are entitled;

25       D.    Award post-judgment interest on such monetary relief;

26       E.    Grant appropriate injunctive and/or declaratory relief, including, without limitation,

27   an order that requires Defendants to open another DAG Token Swap period to allow Plaintiffs and

28   Class members to swap their ERC-20 DAG Tokens for either the Unused Mainnet DAG Tokens

1   or newly minted Mainnet DAG Tokens in the event that the Unused Mainnet DAG Tokens were

2   burned by Defendants;

3        F.     Award reasonable attorneys' fees and costs; and

4        G.     Grant such further relief that this Court deems appropriate.

5   <u>**JURY DEMAND**</u>

6        Plaintiffs, on behalf of themselves and the putative Class demand a trial by jury on all

7   issues so triable.

8   DATED:  November 16, 2021          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

9

10                    <u>s/ *John T. Jasnoch*</u>
                 John T. Jasnoch (CA 281605)

11                    600 W. Broadway, Suite 3300
                 San Diego, CA 92101

12                    Telephone: 619-233-4565
                 jjasnoch@scott-scott.com

13                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                 Sean T. Masson (*pro hac vice* forthcoming)

14                    The Helmsley Building
                 230 Park Avenue, 17th Floor

15                    New York, NY 10169
                 Telephone: 619-233-6444

16                    smasson@scott-scott.com

17                    *Counsel for Plaintiffs and the Proposed Class*

18

19

20

21

22

23

24

25

26

27

28